UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:20-CR-66-MOC-DSC

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Vs. | ) | **ORDER** |
|  | ) |  |
| **JAMES JOSEPH PODBIELSKI**, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. No. 12). Having considered Defendant's motion, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following findings, conclusions, and Order denying Defendant's motion.

### FINDINGS AND CONCLUSIONS

#### I. PROCEDURAL BACKGROUND

On August 4, 2020, Defendant was charged by a federal grand jury with possession with intent to distribute 5 grams or more of "actual" meth, in violation of Title 21, United States Code, Section 841(a)(1). The meth was found pursuant to a search of a vehicle Defendant was driving. Defendant has moved to suppress the evidence found incident to the search, arguing that the search was unlawful and therefore the evidence seized as well as Defendant's statements should be excluded under the Fourth Amendment's "fruit of the poisonous tree" doctrine. The Government has responded in opposition to the motion. The Court held a hearing on the motion on May 13, 2021, and the parties subsequently filed supplemental memoranda. This matter is ripe for disposition.

## II. FACTUAL BACKGROUND

On July 25, 2019, at 2:46:09 a.m., while patrolling Highway 441 North, Deputy Robert Porter of the Jackson County Sheriff's Office ("JCSO") noticed a silver sport utility vehicle ("SUV") with a Georgia license plate in front of him. The SUV was driving in the right or slow lane on Highway 441. Porter followed the SUV a short distance and observed that it crossed the fog line twice. Deputy Porter changed lanes and passed the SUV on the left. He noticed, looking in his rearview mirror, that the SUV proceeded to cross the yellow dotted line down the center of the highway.

Suspecting that the driver might be intoxicated and/or driving under the influence, Deputy Porter slowed down so the SUV would pass him on the right so Porter could conduct a traffic stop. The posted speed limit was 50 m.p.h., and Deputy Porter had to slow down to 35 m.p.h. before the SUV would pass him. Deputy Porter found that suspicious. During past encounters, such as when Deputy Porter would pull alongside a moving vehicle to obtain its license plate number, Deputy Porter did encounter drivers who would slow down somewhat once they saw him and/or his vehicle–down to the posted speed limit or, at most, 5 m.p.h. slower than they had been going before seeing him and/or his vehicle. He had never encountered a driver who slowed down to such an extent that they were going 15 m.p.h. below the posted speed limit.

Once the SUV passed him, Deputy Porter changed lanes, got behind the SUV, and activated his blue lights, initiating a vehicle stop to investigate whether the driver was intoxicated and/or driving under the influence. The SUV stopped at the intersection of Highway 441 North and Olivet Church Road in Whittier, North Carolina–within Jackson County–very shortly after Deputy Porter activated his blue lights. Deputy Levi Woodring of the JCSO was dispatched to the scene as well–at 2:46:37 a.m. Deputy Porter approached the SUV's front

passenger side door. Defendant was the driver and Anna Parton ("Parton"), a local resident, was his front passenger. Deputy Porter told Defendant why he stopped them and Defendant stated that he understood. Neither Defendant nor Parton appeared to be overly nervous or any more nervous than the average driver or passenger was when confronted by Deputy Porter during a vehicle stop in the past. As he spoke with Defendant, Deputy Porter noticed that Parton's pants were completely unzipped.

      Deputy Porter became suspicious that Defendant and Parton were engaged in criminal activity, specifically drug trafficking. Deputy Porter had prior experience investigating narcotics trafficking offenses, as he conducted or was involved in numerous vehicle stops in the past that led to the seizure of distribution quantities of controlled substances. Those quantities included ounce quantities of methamphetamine ("meth"), multi-ounce quantities of meth, and up to 5 ½ kilograms of meth. Deputy Porter knew that the Atlanta, Georgia area is a major drug hub or distribution center for drugs trafficked in the Western District of North Carolina and that Highway 441 is the most direct route from the Atlanta, Georgia area to the Jackson County, North Carolina area. Deputy Porter had also encountered numerous individuals during past vehicle stops, both male and female, who concealed drugs in their underwear. He also previously encountered females who had concealed drugs inside their vaginas.

      Deputy Porter asked Defendant if he would exit the SUV to speak with him. Suspecting that Defendant and Parton were involved in drug trafficking, Deputy Porter wanted to separate Defendant from any dangerous objects that might be in the vehicle such as a firearm. He also wanted to question Defendant and Parton separately about their travel to see if their stories were consistent.

3

Deputy Woodring arrived on the scene to assist at 2:50:07 a.m. and parked behind Deputy Porter's vehicle. Once out of the vehicle, Deputy Porter observed that Defendant appeared to become more nervous. Deputy Porter asked Defendant if he had a driver's license. Defendant replied that he did. As Defendant was removing his license from his wallet, Deputy Porter asked Deputy Woodring to get Parton's information. Defendant handed his Georgia driver's license to Deputy Porter, who in turn gave it to Deputy Woodring and asked him to run Defendant and Parton through Dispatch, checking on their licenses and to see if they had any active warrants. Deputy Woodring took Defendant's driver's license, got Parton's information, and returned to his vehicle to run them through Dispatch.

While Deputy Woodring did that, Deputy Porter spoke to Defendant. Deputy Porter asked Defendant where he was coming from, where he was going, and how he knew Parton. Defendant stated that he was from Georgia, that Parton was an acquaintance he met at the casino (believed to be a reference to the Harrah's Casino in Whittier), that he was staying on Olivet Church Road in Whittier, and that was where they were headed when Deputy Porter pulled them over. Deputy Porter became more suspicious, given that Defendant was from Georgia and Parton was a local. Deputy Porter knew, having worked security at Harrah's Casino for five years, that the bulk of the drugs encountered at and around the casino came from the Atlanta, Georgia area. While questioning Defendant, Deputy Porter also became more suspicious because Defendant was shifting around on his feet a lot, was unable to stand still, had a shaky voice, and was visibly sweating even though it was in the high 50s and cool outside. Deputy Porter often has drivers exit their vehicle during vehicle stops to talk to them. Normally, aside from the normal nervousness most drivers exhibit when speaking with an officer, those drivers could stand still, engage in a conversation with him in a normal voice, and do not sweat like

4

Defendant. However, Deputy Porter did encounter similar signs of nervousness in the past–such as the inability to stand still and a shaky voice–during vehicle stops that led to the seizure of contraband, including drugs, from the stopped vehicles.

Parton was still seated in the SUV. Deputy Porter then went over to Parton and asked her the same basic questions. While Parton's answers matched Defendant's answers, she would not make eye contact with Deputy Porter. More specifically, she would look past him or around the vehicle as he was speaking with her. Although Deputy Porter encountered drivers in the past during vehicle stops that did not continuously make eye contact with him, Deputy Porter found Parton's behavior suspicious. He did not generally encounter that type of behavior in passengers during vehicle stops, as they had nothing to be concerned about during a vehicle stop related to the driving of the driver. In addition, Parton was not just avoiding eye contact. She was looking around the vehicle as if attempting to make sure something she did not want him to see was out of sight. Parton's actions were consistent with behavior exhibited by individuals during past vehicle stops where contraband, including drugs, were found in the stopped vehicles. When asked why her pants were unzipped, Parton stated that she just used the bathroom and must have forgotten to zip her pants back up. Deputy Porter became more suspicious, as he knew from experience that there was nothing open at that time of night between Harrah's Casino and their current location.

While still waiting on a response from Dispatch to their inquiries, Deputy Porter asked Defendant if there was anything illegal in the SUV. Defendant denied having anything illegal in his SUV, and he appeared to be upset that Deputy Porter asked, as Defendant's tone of voice changed. When asked if it was okay to conduct a consent search of the SUV, Defendant said that he did not want anyone searching the vehicle. Dispatch called back at 2:48:24 a.m. and Deputy

5

Porter waited for Dispatch to finish providing information on Defendant and Parton. Dispatch advised that the SUV was registered to Defendant and that the registration was valid. Dispatch advised at 2:50:40 a.m. that Defendant's driver's license was suspended in Georgia and that he had two active criminal summonses out of Jackson County, North Carolina.

Dispatch further advised that the summonses were electronic, meaning that they were in the North Carolina Statewide Warrant Repository ("NCAWARE") and could be served anywhere in North Carolina, and that they were for trespassing. Finally, Dispatch advised at 2:51:12 a.m., that Parton also had a suspended driver's license. Neither Defendant nor Parton had any active warrants.

While standing by the SUV, Deputy Porter, due to the actions and behavior Defendant and Porter were displaying, all of which were inconsistent with innocent travelers and consistent with the actions and behavior exhibited by individuals during past vehicle stops where contraband, including drugs, were found in the stopped vehicles, requested through Dispatch that Senior Deputy Megan Rhinehart respond to the scene with her K9 so she could run her K9 around the outside of the SUV to determine if there were drugs in the vehicle and if Defendant and/or Porter were engaged in criminal activity.

Deputy Porter then returned to his vehicle and began preparing Defendant's citation for no operator's license and driving left of center. More specifically, Deputy Porter logged onto the e-Citation computer program to prepare the citation. He also logged onto the North Carolina Statewide Warrant Repository or "NCAWARE" to print off the two criminal summonses for Defendant so he could serve them on Defendant. They were both for trespassing at the Harrah's Casino, once in May of 2019 and then another time in October of 2019. Deputy Porter noticed that one of the court dates on the summonses had already passed so he had to obtain a new court

date for Defendant to report. Because Defendant was from Georgia, associating with a local, and staying locally, Deputy Porter logged onto a third computer program, records management system ("RMS"), to determine if there was anything else to be served on Defendant, such as any orders related to past due child support.

Senior Deputy Rhinehart arrived on the scene at 3:05:49 a.m. while Deputy Porter was still in his vehicle working on Defendant's citation and summonses, and she parked behind Deputy Woodring's vehicle, meaning that the order of vehicles at the scene was Defendant's SUV, then Deputy Porter's vehicle, then Deputy Woodring's vehicle, and finally Senior Deputy Rhinehart's vehicle. Senior Deputy Rhinehart checked in with Deputy Porter to see what he had and left him working in his vehicle, as she went to get her K9 out of her own vehicle.

While Deputy Porter was still working on Defendant's citation and summonses and running his checks, Senior Deputy Rhinehart got her K9, Jax, out of her vehicle. She walked the three car lengths to the SUV so she could start to run Jax around the outside of the SUV. Senior Deputy Rhinehart observed that Defendant and Parton, who was out of the SUV by then, were nervous. Both were acting erratic and seemed paranoid about what the deputies were doing.

Compared to the average driver and/or passenger who do not have contraband in their vehicle during a vehicle stop and who show some normal level of nervousness when dealing with the police, both Defendant and Parton showed an increased level of nervousness. As Senior Deputy Rhinehart began the dog sniff, Deputy Porter was getting out of his vehicle with Defendant's citation and criminal summonses. As Deputy Porter walked over to and began speaking with Defendant, Deputy Rhinehart ran Jax around the SUV one time in a clockwise motion. She then ran Jax around the SUV one time in a counter-clockwise motion. During the second pass, Jax alerted to the driver's side door seam, sitting down to indicate the presence of a

7

narcotic odor emanating from the SUV and providing Senior Deputy Rhinehart with probable cause to believe that there was a controlled substance in the SUV. The entire process–from getting Jax out of her vehicle, to walking over to the SUV, doing the two passes, and Jax alerting–took, at most, 3 or 4 minutes.

It took Deputy Porter longer to speak with Defendant. While speaking with Defendant, Deputy Porter gave the citation to Defendant, explained what he wrote up, and what he had observed that formed the basis of the citation. Defendant advised that he understood. Deputy Porter also notified Defendant of the court date to appear on the summons and, since Defendant was not local, explained where the courthouse was located. Defendant advised that he understood.

Deputy Porter then served each criminal summons on Defendant, reading them in their entirety to Defendant as required. Defendant advised that he understood. Deputy Porter's conversation with Defendant about the citation and criminal summonses lasted approximately five minutes. Senior Deputy Rhinehart was already finished with the dog sniff by the time Deputy Porter and Defendant finished speaking about the citation and criminal summonses. In fact, Deputy Porter observed Senior Deputy Rhinehart making her second pass around the SUV and then walk away from the SUV before he finished speaking with Defendant about the citation and criminal summonses.

Defendant, after receiving the citation and criminal summonses and having everything explained to him by Deputy Porter, asked "Okay, am I free to go?" At the time of Defendant's question, Senior Deputy Rhinehart was walking back to her vehicle to put Jax away. Based on standard operating procedure, Senior Deputy Rhinehart did not call over to Deputy Porter to advise him of the alert while still at the SUV, walking back to her vehicle, or while back at her

vehicle putting Jax away to avoid alerting Defendant when she is tied up with Jax and unable to assist if Defendant reacts poorly to the news that the dog alerted on the SUV.

Rather, Senior Deputy Rhinehart normally waits until she can walk back over to where the deputy that requested her assistance is standing to tell him or her the result of the dog sniff. When Defendant asked Deputy Porter if he was free to go, Deputy Porter explained that they needed to see whether the K9 alerted to the SUV–referring to the fact that he was waiting for Senior Deputy Rhinehart to walk over and tell him what, if anything, happened during the dog sniff. Senior Deputy Rhinehart walked over and advised that her K9 alerted on the driver's side door seam of the SUV.

It took Senior Deputy Rhinehart less than a minute–or the time to walk three car lengths after putting Jax away–to reach Deputy Porter and inform him of the alert on the SUV. Deputies Porter and Woodring then began a probable cause search of the SUV. Deputy Woodring found a plastic bag sticking out from under the front passenger seat. It contained a set of digital scales and about 1.4 ounces of meth. Deputy Woodring handcuffed Parton and Deputy Porter handcuffed Defendant. The deputies continued their search but found no further contraband. Defendant was arrested and placed in the rear of Deputy Porter's vehicle and Parton was arrested and placed in the rear of Deputy Woodring's vehicle at 3:29:51 a.m. Deputy Porter requested at 3:29:53 a.m. that dispatch send the next available rollback to his location to haul away the SUV. Senior Deputy Rhinehart and her K9 cleared the scene at 3:38:33 a.m.

While waiting for the rollback to arrive to haul away the SUV, Defendant told Deputy Porter that he wanted to talk. Deputy Porter advised Defendant of his Miranda rights. Defendant stated that he understood his rights and still wished to talk to Deputy Porter. Defendant then said "she don't need to be going to jail (referring to Parton). It was all mine." Deputy Porter

explained that Parton was still going to jail. Parton began yelling that she did not understand why she was going to jail. Deputy Porter advised Parton of her Miranda rights. Parton stated that she understood her rights. Deputy Porter explained to Parton that she was going to jail as well because the drugs were found under her seat and the fact that her pants had been unzipped. Parton denied hiding anything and similarly claimed that she did not need to go to jail.

D&M Towing arrived on the scene and took possession of the SUV. Deputies Porter and Woodring cleared the scene at 3:38:33 a.m. Deputy Woodring transported Parton at 4:13:06 a.m. to the Jackson County Detention Center for processing, arriving at 4:26:03 a.m.[1] Deputy Porter transported Defendant at 4:14:37 a.m. to the Jackson County Detention Center for processing, arriving at 4:28:48 a.m. Defendant and Parton were charged with numerous local charges, including Trafficking Meth. At a later time, Defendant spoke to investigators again and made additional incriminating statements.

The case was adopted by the United States Drug Enforcement Administration ("DEA") for federal prosecution and the drug exhibit was sent to the DEA's Mid-Atlantic Laboratory in Largo, Maryland for analysis. The lab confirmed the presence of meth, found that it was 68% pure, and found that it contained 27.49 grams of "actual" meth. Defendant was subsequently charged by a federal grand jury with possession with intent to distribute 5 grams or more of "actual" meth, in violation of Title 21, United States Code, Section 841(a)(1).

## III. DISCUSSION

---

[1] A detention officer searched Parton and found a metal container in her vagina. There were several pills in the metal container. While the container and pills explained why Parton's pants were unzipped, the quantity present did not indicate that Parton was involved in a trafficking offense. With Defendant admitting that the meth and scales were his, the Government declined to charge Parton with a federal offense.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., 4th Amend. The temporary detention of an individual during a vehicle stop is a "seizure" of "persons" within the meaning to the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10 (1996). Thus, a vehicle stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Id. at 810. The United States Supreme Court has held that the "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. Probable cause is defined as "reasonable ground for belief of guilt supported by less than prima facie proof but more than mere suspicion." United States v. Leak, 123 F.3d 787, 792 (4th Cir. 1997).

Defendant does not challenge the initial traffic stop in this case. Rather, Defendant argues that the initial lawful traffic stop became unlawful when it was prolonged beyond the time reasonably required to address the traffic infraction that warranted the initial stop. More specifically, Defendant argues that he already had his citation for driving left of center in hand and was ready to leave, but Deputy Porter violated his Fourth Amendment rights when he unlawfully extended the stop to allow Senior Deputy Rhinehart and her K9 "to finish" or "to complete" the dog sniff, contrary to the Supreme Court's ruling in Rodriguez v. United States. For the following reasons, the Court disagrees.

"A seizure that is lawful at its inception can violate the Fourth Amendment if its manner or execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). A "seizure that is justified solely by the interest in issuing a . . . ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id. Stated another way:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission – to address the traffic violation that warranted the stop . . . and attend to related safety concerns.

Rodriguez v. United States, 575 U.S. 348, 354 (2015) (internal quotation marks and citations omitted). As the Fourth Circuit recognized in United States v. DiGiovanni, the Court "analyze[s] the propriety of a traffic stop on two fronts":

> First. . .whether the police officer's action was justified at its inception. . .[and] Second. . .whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.

650 F.3d 498, 506 (4th Cir. 2011) (internal citations omitted). Here, as stated above, there is no contention that Deputy Porter's actions in pulling Defendant over for, at a minimum, driving left of center was unlawful.

The Fourth Circuit recognizes that the analysis as to the second front—whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop—is more detailed in that the seizure "must be limited both in scope and duration." Id. at 507. Regarding that more detailed analysis, the Fourth Circuit has stated that:

> [w]ith regard to the scope component, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. . . With regard to the duration component, we evaluate whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

Id. (citations and internal quotations omitted). The ordinary tasks incident to a traffic stop for a traffic infraction often include "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017).

Here, Deputy Porter, having observed the SUV cross the fog line twice before it crossed the dotted yellow line down the highway, also suspected that the driver of the SUV might be intoxicated and/or driving under the influence. Once Deputy Porter had the SUV pulled over, he engaged in the ordinary tasks incident to a traffic stop for driving left of center and investigating a possible intoxicated driver–telling Defendant and Parton why he stopped them, having Defendant exit the vehicle and talk to him, and obtaining Defendant's and Parton's licenses and/or information to run them and check if they had any outstanding warrants.

During the interaction with Defendant and Parton, Deputy Porter became suspicious that they were involved in drug trafficking because Defendant was driving a vehicle from Georgia; he was traveling on Highway 441, which is the most direct route from the Atlanta, Georgia area to the Jackson County, North Carolina area; the Atlanta, Georgia area is a major drug hub or distribution center for drugs trafficked in Western North Carolina; Defendant slowed down a lot when he saw Deputy Porter's vehicle; Parton's pants were unzipped, and Deputy Porter had encountered individuals during past stops who concealed drugs in their underpants or, more specifically, women who concealed drugs in their vagina; Defendant appeared to be very nervous in that he was unable to stand still, had a shaky voice and was sweating when questioned despite the temperature; Parton appeared to be very nervous when questioned in that she, for example, was looking around the SUV as if attempting to make sure something she did not want Deputy Porter to see was out of sight; Parton's excuse for having unzipped pants did not make sense; and Defendant appeared to become upset when asked if there was anything illegal in the SUV–all of which was inconsistent with innocent travelers and consistent with the actions and behavior exhibited by individuals during past vehicle stops where contraband, including drugs, were found in the stopped vehicles.

Defendant complains that Deputy Porter was conducting a drug investigation during the traffic stop because of some of the questions he asked. It is well settled, however, that an officer's questions or actions while carrying out the tasks required during a traffic stop "need not be solely and exclusively focused on the purpose of that detention." DiGiovanni, 650 F.3d at 507. For example:

> a police officer may ask questions unrelated to the purpose of the stop, provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention.

Id. (internal quotation marks omitted); see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) (permitting officer inquiries into unrelated matters "so long as those inquiries do not measurably extend the duration of the stop"). None of the actions taken or questions asked by Deputy Porter extended the encounter between Deputy Porter and Defendant beyond the period reasonably necessary to effectuate the purposes of the lawful detention. All of Deputy Porter's above described actions and questions took place while waiting for Dispatch to report back after running the information on Defendant and Parton. Once he received the information from Dispatch that the SUV was properly registered to the defendant, that Defendant's driver's license was suspended in Georgia, that there were two outstanding criminal summonses for Defendant, that Parton also had a suspended driver's license, and that neither had any active warrants, Deputy Porter took a moment to request through Dispatch that Senior Deputy Rhinehart and her K9 respond to the scene, but he otherwise proceeded back to his vehicle to begin preparing Defendant's citation for no operator's license and driving left of center and to print off the two criminal summonses that needed to be served on Defendant.

Dog sniffs are not fairly characterized as part of an officer's traffic mission. Rodriguez, 575 U.S. at 354, 356. However, the United States Supreme Court recognized in Caballes that

"any interest in possessing contraband cannot be deemed legitimate" and a K9 sniff that "only reveals the possession of contraband" during a lawful traffic stop, "generally does not implicate legitimate privacy interests." 543 U.S. at 408–09. To that end, "[a]ny intrusion on [the defendant's] privacy expectations does not arise to the level of a constitutionally cognizable infringement." Id. at 409. As such, unless the use of the K9 in this case measurably extended the duration of the stop, there was no constitutional violation.

The Court finds that the use of the K9 in this case did not measurably extend the duration of the stop. Thus, there was no Fourth Amendment violation. Contrary to what Defendant alleges, the evidence shows that Deputy Porter did not tell Defendant when asked if he was "free to go" that "the drug dog had not completed its task." (Document 13, p. 8). Nor did Deputy Porter, as alleged, comment about the "drug dog needing to complete its sniff." (Id. at p. 9). Rather, the evidence show that Senior Deputy Rhinehart arrived on the scene at 3:05:49 a.m., while Deputy Porter was still in his vehicle working on Defendant's citation and criminal summonses. Senior Deputy Rhinehart checked in with Deputy Porter to see what he had and left him working in his vehicle as she went to get her K9, Jax, out of her own vehicle. While Deputy Porter was still working on Defendant's citation and criminal summonses and running his checks, Senior Deputy Rhinehart got Jax out of her vehicle. As Senior Deputy Rhinehart began the dog sniff, Deputy Porter was getting out of his vehicle with Defendant's citation and criminal summonses. As Deputy Porter walked over to and began speaking with Defendant, Deputy Rhinehart ran Jax around the SUV one time in a clockwise motion. She then ran Jax around the SUV one time in a counter-clockwise motion. During the second pass, Jax alerted to the driver's side door seam, sitting down to indicate the presence of a narcotic odor emanating from the SUV, and providing Senior Deputy Rhinehart with probable cause to believe that there was a

controlled substance in the SUV. The entire process–from getting Jax out of her vehicle, to walking over to the SUV, doing the two passes, and Jax alerting–took, at most, 3 or 4 minutes. It took Deputy Porter longer to speak with Defendant about the citation, criminal summonses, court date, and court location. It was only after the dog sniff was completed and Deputy Porter wrapped up the stop that Defendant asked "Okay, am I free to go?" When Defendant asked this question, Senior Deputy Rhinehart was already walking back to her vehicle to put Jax away.

The United States Supreme Court anticipated a situation where an officer might prolong or slow-walk a traffic stop to allow for a dog sniff to be completed before the completion of the stop which would normally be signaled by the issuing of a warning or ticket and the returning of documents. The "critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket. . .but whether conducting the sniff prolongs [or] adds time to the stop." Rodriguez, 575 U.S. at 357 (internal quotation marks and citations omitted). Therefore, the question becomes what amount of time is reasonably required to complete the stop's mission. The Court recognized in Rodriguez that courts should focus on what the officer did and how he did it during the traffic stop. Id. If the officer can complete his tasks "expeditiously, then that is the amount of time reasonably required to complete the stop's mission." Id. (internal quotation marks omitted) (citing Caballes, 543 U.S. at 407).

Here, the amount of time reasonably required for Deputy Porter to complete the stop's mission once he heard back from Dispatch included the time necessary to begin preparing Defendant's citation for no operator's license and driving left of center. To do that, he had to log onto the e-Citation computer program. He also had to log onto the North Carolina Statewide Warrant Repository or "NCAWARE" to pull up and print off the two criminal summonses for Defendant so he could serve them on Defendant. Both criminal summonses were for trespassing

at the Harrah's Casino–once in May of 2019 and then another time in October of 2019. Deputy Porter noticed that one of the court dates on the summonses had already passed, so he had to obtain a new court date for Defendant to report. Because Defendant was from Georgia, associating with a local, and staying locally, Deputy Porter also logged onto a third computer program, RMS, to run Defendant to determine if there was anything else to be served on Defendant, such as any orders related to past due child support.

      Deputy Porter then had to get out of his vehicle and walk over to and begin speaking with Defendant. While speaking with Defendant, Deputy Porter gave the citation to Defendant, explained what he wrote up, and what he had observed that formed the basis of the citation. Defendant advised that he understood. Deputy Porter also notified Defendant of the court dates to appear on the summonses and, since he was not local, explained where the courthouse was located. Defendant advised that he understood. Deputy Porter then served each criminal summons on Defendant, reading them in their entirety to Defendant as required. Defendant advised that he understood. Deputy Porter's conversation with Defendant about the citation and criminal summonses lasted approximately five minutes, and Deputy Rhinehart was already finished with the dog sniff by the time Deputy Porter and Defendant finished speaking about the citation and criminal summonses. Clearly, Deputy Porter only took the amount of time reasonably required to complete the stop's mission. The dog sniff in this case took place in its entirety within that timeframe.

      As the Government notes, the timing of the dog sniff at issue in <u>Rodriguez</u> that led to the Supreme Court vacating the conviction in that case was critically different than the timing of the dog sniff in this case. In <u>Rodriguez</u>, the stopping officer completed the stop—including issuing a written warning, explaining the warning, returning all documents, and otherwise "[getting] all

17

the reasons for the stop out of the way" and "[taking] care of all the business"—before asking for and being denied consent to conduct a dog sniff. 575 U.S. at 352. The stopping officer then proceeded to detain the driver until another officer could arrive on the scene in order to run his K9 around the outside of the stopped vehicle. Id. "Seven or eight minutes" passed between the time of issuing the warning and the K9 alert. Id. The Rodriguez Court, therefore, found that the dog sniff in that case added time to or prolonged the stop that had otherwise been completed seven to eight minutes earlier. Here, on the other hand, the dog sniff took place, in its entirety, before Deputy Porter completed the stop with Defendant.

In arguing that the stop was extended in this case in violation of his Fourth Amendment rights, Defendant also cites United States v Williams, 808 F.3d 238, 243 (4th Cir. 2015). In Williams, the stopping officer completed the stop and issuing a written warning before he and a second officer on the scene asked for and were denied consent to conduct a search of the vehicle. More than a minute after the stopping officer issued the written warning, the second officer proceeded to detain the driver so he could run his K9 around the outside of the stopped vehicle. Id. Almost three additional minutes passed between the time of detaining the driver and the K9 alert. Id. The Fourth Circuit held that the dog sniff in that case added time to or prolonged the stop that had otherwise been completed several minutes earlier. Again, as stated above, the dog sniff in this case took place, in its entirety, before Deputy Porter completed the stop with Defendant. Moreover, Deputy Porter was entitled to find out the results of the dog sniff before letting Defendant go. Therefore, the facts in this case simply do not fit within the facts of Williams or Rodriguez. In sum, for all these reasons, the Court finds that the use of the K9 in this

18
Case 1:20-cr-00066-MOC-WCM   Document 30   Filed 08/11/21   Page 18 of 19

case did not measurably extend the duration of the stop.[2] Thus, there was no Fourth Amendment violation.

## IV. CONCLUSION

On Defendant's motion to suppress, this Court finds that the K9 sniff did not improperly extend the vehicle stop because it was completed before the completion of the vehicle stop. Thus, there was no Fourth Amendment violation. Accordingly, for the reasons stated herein, the Court denies Defendant's motion to suppress.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress, (Doc. No. 12), is **DENIED**.

Signed: August 11, 2021

Max O. Cogburn Jr
United States District Judge

---

[2] The Government argues that, alternatively, even if the stop was, in fact, extended, Deputy Porter had reasonable suspicion of drug activity to extend the vehicle stop before even requesting Senior Deputy Rhinehart and her K9. Because the Court finds that the stop was not extended, the Court does not address this alternative argument.